482 F.3d 135
 ITC LIMITED and ITC Hotels Limited, Plaintiffs-Counter-Defendants-Appellants,
v.
PUNCHGINI, INC., Raja Jhanjee, Paragnesh Desai, Vicky Vij, Dhandu Ram, Mahendra Singh, Bachan Rawat, Bukhara Grill II, Inc., Defendants-Counter-Claimants-Appellees.
Docket No. 05-0933-cv.
 United States Court of Appeals, Second Circuit.
 Argued: November 18, 2005.
 Decided: March 28, 2007.
 
 Ethan Horwitz (Kandis M. Koustenis, William F. Sheehan, Robert D. Carroll, Terri L. McHenry, on the brief), Goodwin Procter, New York, NY, for Plaintiffs.
 Michelle Mancino Marsh (Michael J. Freno, on the brief), Kenyon & Kenyon, New York, NY, for Defendants.
 Before STRAUB and RAGGI, Circuit Judges.[1]
 RAGGI, Circuit Judge.
 
 
 1
 This case requires us to decide, among other things, the applicability of the "famous marks" doctrine to a claim for unfair competition under federal and state law. Plaintiffs ITC Limited and ITC Hotels Limited (collectively "ITC") held a registered United States trademark for restaurant services: "Bukhara." They sued defendants, Punchgini, Inc., Bukhara Grill II, Inc., and certain named individuals associated with these businesses, in the United States District Court for the Southern District of New York (Gerard E. Lynch, Judge) claiming that defendants' use of a similar mark and related trade dress constituted trademark infringement, unfair competition, and false advertising in violation of federal and state law. ITC now appeals from the district court's award of summary judgment in favor of defendants on all claims. See ITC Ltd. v. Punchgini, Inc., 373 F.Supp.2d 275 (S.D.N.Y.2005).
 
 
 2
 Having reviewed the record de novo, we affirm the award of summary judgment on ITC's infringement claim, concluding, as did the district court, that ITC abandoned its Bukhara mark for restaurant services in the United States. To the extent ITC insists that the "famous marks" doctrine nevertheless permits it to sue defendants for unfair competition because its continued international use of the mark led to a federally protected right, we conclude that Congress has not yet incorporated that doctrine into federal trademark law.[2] Therefore, we affirm the award of summary judgment on ITC's federal unfair competition claim. Whether the famous marks doctrine applies to a New York common law claim for unfair competition and, if so, how famous a mark must be to trigger that application, are issues not easily resolved by reference to existing state law. Accordingly, we certify questions relating to these issues to the New York Court of Appeals, reserving our decision on this part of ITC's appeal pending the state court's response. Finally, because we agree with the district court that ITC lacks standing to pursue a false advertising claim against defendants, we affirm that part of the district court's award of summary judgment.[3]
 
 I. Factual Background
 A. The Bukhara Restaurant in New Delhi
 
 3
 ITC Limited is a corporation organized under the laws of India. Through its subsidiary, ITC Hotels Limited, it owns and operates the Maurya Sheraton & Towers, a five-star hotel in New Delhi, India. One of the restaurants in the Maurya Sheraton complex is "Bukhara." Named after a city in Uzbekistan on the legendary Silk Road between China and the West, Bukhara offers a cuisine and decor inspired by the northwest frontier region of India. Since its opening in 1977, the New Delhi Bukhara has remained in continuous operation, acquiring a measure of international renown.[4]
 
 
 4
 Over the past three decades, ITC has sought to extend the international reach of the Bukhara brand. At various times, it has opened or, through franchise agreements, authorized Bukhara restaurants in Hong Kong, Bangkok, Bahrain, Montreal, Bangladesh, Singapore, Kathmandu, Ajman, New York, and Chicago. As of May 2004, however, ITC-owned or -authorized Bukhara restaurants were in operation only in New Delhi, Singapore, Kathmandu, and Ajman.
 
 
 5
 B. ITC's Use of the Bukhara Mark in the United States
 
 
 6
 1. ITC's Use and Registration of the Mark for Restaurants
 
 
 7
 In 1986, an ITC-owned and -operated Bukhara restaurant opened in Manhattan. In 1987, ITC entered into a franchise agreement for a Bukhara restaurant in Chicago. Shortly after opening its New York restaurant, ITC sought to register the Bukhara mark with the United States Patent and Trademark Office ("Patent and Trademark Office"). On October 13, 1987, ITC obtained United States trademark registration for the Bukhara mark in connection with "restaurant services." See United States Trademark Registration No. 1,461,445 (Oct. 13, 1987). The Manhattan restaurant remained in operation for only five years, closing on December 17, 1991. On August 28, 1997, after a decade in business, ITC cancelled its Chicago franchise. Notwithstanding its registration, ITC concedes that it has not owned, operated, or licensed any restaurant in the United States using the Bukhara mark since terminating the Chicago restaurant franchise.
 
 2. Use of the Mark for Packaged Foods
 
 8
 Over three years later, in 2001, ITC commissioned a marketing study to determine the viability of selling packaged food products in the United States under the Bukhara label, including "Dal Bukhara."[5] In that same year, ITC filed an application with the Patent and Trademark Office to register a "Dal Bukhara" mark in connection with packaged, ready-to-serve foods. In May 2003, ITC sold packaged Dal Bukhara food products to two distributors, one in California and the other in New Jersey. One month later, in June 2003, ITC exhibited Dal Bukhara products at the International Fancy Foods Show in New York City.
 
 
 9
 C. The Opening of "Bukhara Grill"
 
 
 10
 Meanwhile, in 1999, named defendants Raja Jhanjee, Vicky Vij, Dhandu Ram, and Paragnesh Desai, together with Vijay Roa, incorporated "Punchgini, Inc." for the purpose of opening an Indian restaurant in New York City. Jhanjee, Vij, and Ram had all previously worked at the New Delhi Bukhara, and Vij had also previously worked at ITC's New York Bukhara. In selecting a name for their restaurant, the Punchgini shareholders purportedly considered "Far Pavilions" and "Passage to India" before settling on "Bukhara Grill." As Vij candidly acknowledged at his deposition, there was then "no restaurant Bukhara in New York, and we just thought we will take the name." Vij Dep. 25:7-11, May 5, 2004. After some initial success with "Bukhara Grill," several Punchgini shareholders, with the support of two additional partners, defendants Mahendra Singh and Bachan Rawat, organized a second corporation, "Bukhara Grill II, Inc.," in order to open a second New York restaurant, "Bukhara Grill II."
 
 
 11
 When the record is viewed in the light most favorable to ITC, numerous similarities suggestive of deliberate copying can readily be identified between the defendants' Bukhara Grill restaurants and the Bukhara restaurants owned or licensed by ITC. Quite apart from the obvious similarity in name, defendants' restaurants mimic the ITC Bukharas' logos, decor, staff uniforms, wood-slab menus, and red-checkered customer bibs. Indeed, the similarities were sufficiently obvious to be noted in a press report, wherein defendant Jhanjee is quoted acknowledging that the New York Bukhara Grill restaurant "is quite like Delhi's Bukhara." Shweta Rajpal, "Dal `Bukhara' in NY: A Bukhara-trained Trio Has Opened a Similar Restaurant in Manhattan," Hindustan Times, May 2, 2000; see also Bob Lape, "Indian Outpost Needs Dash of Spice," Crain's New York Business, Dec. 13-19, 1999, at 18 (noting name similarity between Bukhara Grill and former New York Bukhara).
 
 D. Plaintiffs' Cease and Desist Letter
 
 12
 By letter dated March 22, 2000, ITC, through counsel, demanded that defendants refrain from further use of the Bukhara mark. The letter accused defendants of unlawfully appropriating the reputation and goodwill of ITC's Bukhara restaurants in India and the United States by adopting a virtually identical name for their New York Bukhara Grill restaurants. It further demanded, under threat of legal action, that defendants acknowledge ITC's exclusive rights to the Bukhara mark, disclose the period for which defendants had used the mark, and remit to ITC any profits derived therefrom.
 
 
 13
 In a response dated March 30, 2000, defendants' counsel expressed an interest in avoiding litigation. Nevertheless, counsel observed that ITC appeared to have abandoned the Bukhara mark by not using it in the United States for several years. Receiving no reply, defendants' counsel sent a second letter to ITC dated June 22, 2000, stating that, if no response was forthcoming "by June 28, 2000, we will assume that ITC Limited has abandoned rights it may have had in the alleged mark and any alleged claim against our client." Marsh Letter to Horwitz, June 22, 2000. The record indicates no timely reply.
 
 
 14
 Instead, almost two years later, on April 15, 2002, ITC's counsel wrote to defendants reiterating the demands made in March 2000 and complaining of defendants' failure formally to respond to that initial letter. Defendants' counsel promptly challenged the latter assertion; faulted ITC for failing to reply to his March 22, 2000 letter; and reasserted his abandonment contention, a position that he claimed was now bolstered by the passage of additional time. There was apparently no further communication among the parties until this lawsuit.
 
 E. The Instant Lawsuit
 
 15
 On February 26, 2003, ITC filed the instant lawsuit. In the amended complaint that is the controlling pleading for purposes of our review, ITC charged defendants with trademark infringement under section 32(1)(a) of the Lanham Act, see 15 U.S.C. § 1114(1)(a), as well as unfair competition and false advertising under sections 43(a) and 44(h) of the Lanham Act, see 15 U.S.C. §§ 1125(a), 1126(h). ITC also pursued parallel actions under New York common law.[6] As an affirmative defense, defendants charged ITC with abandonment of its United States rights to the Bukhara mark and, on that ground, they filed a counterclaim seeking cancellation of the ITC registration.
 
 
 16
 Following discovery, defendants successfully moved for summary judgment. In a detailed published decision, the district court ruled that ITC could not pursue an infringement claim because the record conclusively demonstrated its abandonment of the Bukhara mark as applied to restaurants in the United States. See ITC Ltd. v. Punchgini, Inc., 373 F.Supp.2d at 285. To the extent ITC asserted that its continued operation of Bukhara restaurants outside the United States allowed it to sue defendants for unfair competition under the famous marks doctrine, the district court was not convinced. It observed that, even if it were to assume the applicability of the famous marks doctrine, ITC had failed to adduce sufficient evidence to permit a reasonable jury to conclude that the name or trade dress of its foreign restaurants had attained the requisite level of United States recognition to trigger the doctrine. See id. at 291. Finally, the district court found that ITC lacked standing to pursue its false advertising claim. See id. at 291-92. This appeal followed.
 
 
 17
 Before this court, ITC advances essentially three arguments. It submits that (1) the record does not conclusively establish its abandonment of United States rights in the Bukhara mark, (2) the district court misapplied applicable federal and state law regarding the famous marks doctrine, and (3) it has standing to sue defendants for false advertising.
 
 II. Discussion
 A. Standard of Review
 
 18
 We conduct de novo review of a summary judgment award, resolving all record ambiguities and drawing all factual inferences in favor of the non-moving party. See, e.g., Phaneuf v. Fraikin, 448 F.3d 591, 595 (2d Cir.2006). We will affirm an award of summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c).
 
 B. Trademark Infringement
 
 19
 ITC sues defendants for trademark infringement in violation of both federal and state law. Under section 32(1)(a) of the Lanham Act, see 15 U.S.C. § 1114(1)(a), the owner of a mark registered with the Patent and Trademark Office can bring a civil action against a person alleged to have used the mark without the owner's consent.[7] Similarly, under New York state law, a mark owner may maintain a statutory or common law action against a party who engages in unauthorized use of the mark. See N.Y. Gen. Bus. Law § 360-k (McKinney 2006) (protecting registered marks); Norden Rest. Corp. v. Sons of the Revolution, 51 N.Y.2d 518, 522-23, 434 N.Y.S.2d 967, 968, 415 N.E.2d 956 (1980) (acknowledging common law rights in unregistered marks). Even if a plaintiff makes the showing required by federal and state law, however, the alleged infringer may nevertheless prevail if it can establish the owner's prior abandonment of the mark. See 15 U.S.C. § 1115(b)(2); Nercessian v. Homasian Carpet Enter., Inc., 60 N.Y.2d 875, 877, 470 N.Y.S.2d 363, 364, 458 N.E.2d 822 (1983) (holding that "rights in a trade name may be lost by abandonment"). Indeed, abandonment is not only an affirmative defense to an infringement action; it is a ground for cancelling a federally registered mark. See 15 U.S.C. § 1064(3).
 
 
 20
 Relying on this principle, defendants submit that ITC's infringement claim is necessarily defeated as a matter of law by proof that, by the time they opened their Bukhara Grill restaurants in New York, ITC had effectively abandoned the Bukhara mark in the United States. Like the district court, we conclude that defendants successfully established abandonment as a matter of law, warranting both summary judgment in their favor and cancellation of ITC's registered mark.
 
 1. The Doctrine of Abandonment
 
 21
 The abandonment doctrine derives from the well-established principle that trademark rights are acquired and maintained through use of a particular mark. See Pirone v. MacMillan, Inc., 894 F.2d 579, 581 (2d Cir.1990) ("`There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed.'" (quoting United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 97, 39 S.Ct. 48, 63 L.Ed. 141 (1918))). This is true even of marks that have been registered with the Patent and Trademark Office. See Basile, S.p.A. v. Basile, 899 F.2d 35, 37 n. 1 (D.C.Cir. 1990) ("Although [a mark's] registration is a predicate to its protection under [section 32(1)(a) of] the Lanham Act, the underlying right depends not on registration but rather on use.").[8] Indeed, one of the fundamental premises underlying the registration provisions in the Lanham Act is that trademark rights flow from priority and that priority is acquired through use. See, e.g., 15 U.S.C. § 1057(c) (stating that registration of mark "shall constitute constructive use of the mark, conferring a right of priority, nationwide in effect . . . against any other person except for a person whose mark has not been abandoned and who, prior to such filing[,] . . . has used the mark"). Thus, so long as a person is the first to use a particular mark to identify his goods or services in a given market, and so long as that owner continues to make use of the mark, he is "entitled to prevent others from using the mark to describe their own goods" in that market. Defiance Button Mach. Co. v. C & C Metal Prods. Corp., 759 F.2d 1053, 1059 (2d Cir.1985); see also Sengoku Works v. RMC Int'l, 96 F.3d 1217, 1219 (9th Cir. 1996) ("It is axiomatic in trademark law that the standard test of ownership is priority of use.").
 
 
 22
 If, however, an owner ceases to use a mark without an intent to resume use in the reasonably foreseeable future, the mark is said to have been "abandoned." See Silverman v. CBS, Inc., 870 F.2d 40, 45 (2d Cir.1989); 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 17:5, at 17-8 (4th ed.2002) (observing that "abandonment" refers to situations involving the "non-use of a mark, coupled with an express or implied intention to abandon or not to resume use"). Once abandoned, a mark returns to the public domain and may, in principle, be appropriated for use by other actors in the marketplace, see Indianapolis Colts, Inc. v. Metro. Baltimore Football Club Ltd. P'ship, 34 F.3d 410, 412 (7th Cir.1994), in accordance with the basic rules of trademark priority, see Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd., 627 F.2d 628, 630 (2d Cir.1980).
 
 2. Demonstrating Abandonment
 
 23
 The party asserting abandonment bears the burden of persuasion with respect to two facts: (1) non-use of the mark by the legal owner, and (2) lack of intent by that owner to resume use of the mark in the reasonably foreseeable future. See 15 U.S.C. § 1127; Stetson v. Howard D. Wolf & Assocs., 955 F.2d 847, 850 (2d Cir.1992); Silverman v. CBS, Inc., 870 F.2d at 45; see also On-Line Careline, Inc. v. America Online, Inc., 229 F.3d 1080, 1087 (Fed.Cir.2000) (placing burden of persuasion on party seeking cancellation on ground of abandonment); Warner Bros. Inc. v. Gay Toys, Inc., 724 F.2d 327, 334 (2d Cir.1983) (placing burden of persuasion on party asserting abandonment as defense).
 
 
 24
 ITC concedes that defendants satisfied the first element through proof that ITC has not used the Bukhara mark for restaurant services in the United States since August 28, 1997. Nevertheless, ITC insists that a triable issue of fact exists with respect to its intent to resume use of the service mark in the United States. To the extent the district court concluded otherwise, ITC submits the court applied an incorrect legal standard. To explain why we are not persuaded by this argument, we begin by discussing the particular legal significance of non-use of a registered mark for a period of at least three years.
 
 3. Prima Facie Evidence of Abandonment
 
 25
 The Lanham Act expressly states that "[n]onuse" of a mark "for 3 consecutive years shall be prima facie evidence of abandonment." 15 U.S.C. § 1127. This court has explained that the term "prima facie evidence" in this context means "a rebuttable presumption of abandonment." Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1044 (2d Cir.1980); accord Silverman v. CBS, Inc., 870 F.2d at 45.
 
 
 26
 The role played by such a presumption is best understood by reference to Rule 301 of the Federal Rules of Evidence:
 
 
 27
 In all civil actions and proceedings not otherwise provided for by Act of Congress or by these rules, a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or to meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of non-persuasion, which remains throughout the trial upon the party on whom it was originally cast.
 
 
 28
 Fed.R.Evid. 301. Although the term "presumption" is not specifically defined in the Rules of Evidence, it is generally understood to mean "an assumption of fact resulting from a rule of law which requires such fact to be assumed from another fact or group of facts found or otherwise established in the action." 21B Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5124 (2d ed.2005); accord Joseph M. McLaughlin, Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 301.02[1] (2d ed.2006); see also Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 n. 10, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) (describing presumption as "legally mandatory inference"). The assumption ceases to operate, however, upon the proffer of contrary evidence. See generally A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1037 (Fed.Cir. 1992) (observing that under Rule 301, a "presumption is not merely rebuttable but completely vanishes upon the introduction of evidence sufficient to support a finding of the nonexistence of the presumed fact"); Saratoga Vichy Spring Co. v. Lehman, 625 F.2d at 1043 (suggesting that presumption of abandonment "disappears when rebutted by contrary evidence").
 
 
 29
 Thus, in this case, the statutory presumption of abandonment requires that one fact, i.e., abandonment, be inferred from another fact, i.e., non-use of the mark for three years or more. The significance of a presumption of abandonment is to shift the burden of production to the mark owner to come forward with evidence indicating that, despite three years of non-use, it intended to resume use of the mark within a reasonably foreseeable time. See Imperial Tobacco, Ltd. v. Philip Morris, Inc., 899 F.2d 1575, 1579 (Fed.Cir.1990) (noting that triggering of presumption "eliminates the challenger's burden to establish the [lack of] intent [to resume use] element of abandonment as an initial part of its case"); see also Cumulus Media, Inc. v. Clear Channel Commc'ns, 304 F.3d 1167, 1176-77 (11th Cir.2002); On-Line Careline, Inc. v. America Online, Inc., 229 F.3d at 1087. The ultimate burden of persuasion on the issue of abandonment, however, remains at all times with the alleged infringer. See Emergency One, Inc. v. American FireEagle, Ltd., 228 F.3d 531, 536 (4th Cir.2000).
 
 
 30
 4. The Evidence Necessary to Defeat a Presumption of Abandonment
 
 
 31
 This court has observed that "to overcome a presumption of abandonment after a sufficiently long period of non-use, a defendant need show only an intention to resume use `within the reasonably foreseeable future.'" Empresa Cubana del Tabaco v. Culbro Corp., 399 F.3d 462, 468 n. 2 (2d Cir.2005) (quoting Silverman v. CBS, Inc., 870 F.2d at 45). ITC submits that the district court erred in imposing a stricter standard, specifically requiring ITC to adduce "`objective, hard evidence of actual concrete plans to resume use in the reasonably foreseeable future when the conditions requiring suspension abate'" to defeat defendants' summary judgment motion. ITC Ltd. v. Punchgini, Inc., 373 F.Supp.2d at 280 (quoting Emmpresa Cubana Del Tabaco v. Culbro Corp., 213 F.Supp.2d 247, 268-69 (S.D.N.Y.2002)).
 
 
 32
 This court has, in fact, criticized the particular language quoted by the district court, observing that such a "heavy burden" is not required by our precedent. See Empresa Cubana del Tabaco v. Culbro Corp., 399 F.3d at 467 n. 2. Courts and commentators are in general agreement that proffered evidence is "sufficient" to rebut a presumption as long as the evidence could support a reasonable jury finding of "the nonexistence of the presumed fact." Wanlass v. Fedders Corp., 145 F.3d 1461, 1464 (Fed.Cir.1998); see also McLaughlin, Weinstein & Berger, supra, § 301.02[3][c] (stating that "the opponent of a presumed fact, in order to rebut, generally has the burden of presenting evidence so that a reasonable jury could be convinced of the non-existence of the presumed fact"); Wright & Graham, supra, § 5126 ("Most writers . . . interpret 301 to require that rebutting evidence suffice to support a finding of the non-existence of the presumed fact."). In short, upon defendants' presentation of evidence establishing a prima facie case of abandonment under the Lanham Act, ITC was required to come forward only with such contrary evidence as, when viewed in the light most favorable to ITC, would permit a reasonable jury to infer that it had not abandoned the mark. Specifically, it needed to adduce sufficient evidence to permit a reasonable jury to conclude that, in the three-year period of non-use — from August 28, 1997, when ITC terminated the Chicago Bukhara franchise, to August 28, 2000 — ITC nevertheless maintained an intent to resume use of its registered mark in the reasonably foreseeable future.[9] See Silverman v. CBS, Inc., 870 F.2d at 47; accord Empresa Cubana del Tabaco v. Culbro Corp., 399 F.3d at 467 n. 2. Hard evidence of concrete plans to resume use of the mark would certainly carry this burden. But we do not foreclose the possibility that other circumstances, viewed in the light most favorable to the non-movant, might also support the necessary jury inference of intent. See, e.g., Geneva Pharms. Tech. Corp. v. Barr Labs., Inc., 386 F.3d 485, 506 (2d Cir.2004) (looking to totality of circumstances to infer intent).
 
 
 33
 5. Defendants' Entitlement to Summary Judgment
 
 
 34
 a. The District Court Did Not Apply an Incorrect Standard
 
 
 35
 Applying these principles to this case, we preliminarily observe that, despite the language cited by ITC, the district court does not appear to have based its summary judgment award on a too strict evidentiary standard of rebuttal with respect to the presumption of abandonment. To the contrary, the district court's ruling, when considered in its entirety, reveals a careful review of the totality of the evidence adduced by ITC and a correct conclusion that no circumstances were adduced from which a reasonable jury could infer that, during the relevant three-year period of non-use, ITC nevertheless intended to resume use of the registered mark in the United States in the reasonably foreseeable future. See ITC Ltd. v. Punchgini, Inc., 373 F.Supp.2d at 280 (stating that ITC had "failed to come forward with any evidence of . . . `activities it engaged in during the nonuse period . . . from which an intent to resume use . . . may be reasonably inferred' . . . to rebut the statutory presumption of abandonment at trial" (quoting Imperial Tobacco, Ltd. v. Philip Morris, Inc., 899 F.2d at 1580)).
 
 
 36
 Even if the district court had applied an erroneous standard, however, we would still affirm its judgment if, upon applying the proper standard on our own review of the record, we were to identify no genuine issue of material fact requiring trial. See Baker v. Home Depot, 445 F.3d 541, 546 (2d Cir.2006) (noting that we may affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law); Stetson v. Wolf, 955 F.2d at 850 (observing in abandonment case that "[a]n appellate court has the power to decide cases on appeal if the facts in the record adequately support the proper result"). This is such a case.
 
 
 37
 b. ITC's Failure to Adduce Evidence from Which a Reasonable Jury Could Infer Intent to Resume Use
 
 
 38
 As this court has recognized, "intent is always a subjective matter of inference and thus rarely amenable to summary judgment." Saratoga Vichy Spring Co. v. Lehman, 625 F.2d at 1044. At the same time, however, "`[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion.'" Distasio v. Perkin Elmer Corp., 157 F.3d 55, 61-62 (2d Cir.1998) (quoting Meiri v. Dacon, 759 F.2d 989, 997 (2d Cir.1985)). The latter point is particularly relevant in the context of an abandonment dispute, because "[i]n every contested abandonment case, the respondent denies an intention to abandon its mark; otherwise there would be no contest." Imperial Tobacco, Ltd. v. Philip Morris, Inc., 899 F.2d at 1581. Thus, courts have generally held that a trademark owner cannot rebut a presumption of abandonment merely by asserting a subjective intent to resume use of the mark at some later date. See Vais Arms, Inc. v. Vais, 383 F.3d 287, 294 (5th Cir.2004) ("At most, [the mark owner's] affidavit establishes only his subjective, uncommunicated desire not to abandon the mark, without any indication of when or how he intended to resume its commercial use; it does not establish a genuine issue as to his intent to abandon."); Emergency One, Inc. v. American FireEagle, Ltd., 228 F.3d at 537 ("[T]he owner of a trademark cannot defeat an abandonment claim . . . by simply asserting a vague, subjective intent to resume use of a mark at some unspecified future date."); Imperial Tobacco, Ltd. v. Philip Morris, Inc., 899 F.2d at 1581 ("An averment of no intent to abandon is little more than a denial in a pleading, which is patently insufficient to preclude summary judgment on the ground the facts are disputed."); see also Silverman v. CBS, Inc., 870 F.2d at 47 ("A bare assertion of possible future use is not enough."). Rather, to rebut a presumption of abandonment on a motion for summary judgment, the mark owner must come forward with evidence "with respect to . . . what outside events occurred from which an intent to resume use during the nonuse period may reasonably be inferred." Imperial Tobacco, Ltd. v. Philip Morris, Inc., 899 F.2d at 1581; accord Emergency One, Inc. v. American FireEagle, Ltd., 228 F.3d at 537-38; see also Silverman v. CBS, Inc., 870 F.2d at 47 (noting that presumption of abandonment can be rebutted "by showing reasonable grounds for the suspension and plans to resume use in the reasonably foreseeable future when the conditions requiring suspension abate"[10]).
 
 
 39
 ITC argues that four facts would allow a reasonable factfinder to infer its intent to resume use of the Bukhara mark for restaurants in the United States: (1) the reasonable grounds for its suspension of use of the mark, (2) its efforts to develop and market a Dal Bukhara line of packaged food, (3) its attempts to identify potential United States restaurant franchisees, and (4) its continued use of the Bukhara mark for restaurants outside the United States. We are not persuaded.
 
 
 40
 (1) Grounds for Suspending Use
 
 
 41
 ITC advances two reasons for suspending use of the Bukhara mark in the United States from 1997 to 2000:(a) Indian regulations requiring it to return profits earned abroad severely hindered its ability to open and operate profitable Bukhara restaurants in the United States, and (b) depressed market conditions in the hospitality industry from 1988 to 2003 inhibited its development of franchise partnerships in the United States. Because these reasons are unsupported by record evidence, they plainly cannot demonstrate the requisite intent.[11]
 
 
 42
 As to the first point, the record indicates that many of the Indian regulations cited by ITC had been in effect since 1973. Clearly, these regulations did not prevent ITC from opening its Bukhara restaurant in New York in 1986 or from licensing a Bukhara restaurant in Chicago in 1987. Although ITC submits that the regulations were a significant factor in the failure of these two restaurants, no evidence was adduced to support this conclusory assertion. See generally Bridgeway Corp. v. Citibank, 201 F.3d 134, 142 (2d Cir.2000) (holding that conclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment). Indeed, the record is to the contrary. When, at deposition, an ITC corporate representative was asked why the New York Bukhara closed, he replied simply that the restaurant was highly leveraged and unable to meet its debt obligations. He made no mention of any Indian regulations. Similarly, the letter by which ITC terminated its Chicago license agreement referenced only the franchisee's failure to pay fees owed to ITC, making no mention of Indian regulations.
 
 
 43
 Further, ITC fails to explain how Indian regulations, which ITC claims applied to any business operated outside India, hindered its use of the Bukhara mark for restaurants in the United States between 1997 and 2000 but permitted it to open a Bukhara restaurant in the United Arab Emirates in 1998. To the extent ITC argues that the regulations limited its options by effectively requiring it to partner exclusively with well-established hotels, it offers no evidence that hotels in the United States were unreceptive to such a partnership arrangement.
 
 
 44
 With respect to ITC's argument that a market decline in the hospitality industry between 1988 and 2003 explains its non-use of the mark, the record indicates only a decline in India and the overseas market. ITC proffered no evidence demonstrating a decline in the United States hospitality market during the relevant 1997-2000 period of non-use.[12]
 
 
 45
 (2) Marketing Dal Bukhara Food Products
 
 
 46
 ITC points to only one piece of evidence during the relevant 1997-2000 period indicating its intent to use the name Bukhara in connection with packaged foods: the minutes from a July 27, 2000 corporate management committee meeting in India, which approved an initiative to market food products under the name "Bukhara Dal." Significantly, the minutes nowhere indicate ITC's intent to market this product in the United States, much less ITC's intent to resume use of the Bukhara mark for restaurants in this country. Accordingly, we conclude that the minutes, by themselves, are insufficient to create a genuine issue of material fact as to ITC's intent to resume use of its registered service mark in the United States.
 
 
 47
 The remaining evidence adduced by ITC all post-dates the relevant 1997-2000 period of non-use. Specifically, in 2001, ITC commissioned a study regarding the marketing of packaged food bearing the Bukhara mark in the United States. That same year, ITC filed trademark applications for several marks containing the word "Bukhara" in relation to packaged food products. Not until 2003 did ITC actually showcase its packaged food line at a New York trade show or sell these products to two United States distributors. These acts, all occurring well after 2000 and suggesting future use of the Bukhara mark for a product other than restaurants, are insufficient to support the necessary inference that, in the non-use period, ITC maintained an intent to resume use of the mark for restaurants in the United States in the reasonably foreseeable future.
 
 
 48
 (3) Identifying Bukhara Franchisees
 
 
 49
 ITC argues that evidence of its discussions with various persons about expanding the Bukhara restaurant franchise to New York, California, and Texas creates a jury issue as to its intent to resume use of its registered mark within a reasonably foreseeable time. In fact, the only evidence of these so-called "discussions" is a few facsimiles, e-mails, and letters sent to ITC over a five-year period from 1998 to 2002. There is no evidence that ITC initiated any of these contacts. More to the point, no evidence indicates that ITC responded to or seriously considered these unsolicited proposals in a manner that would permit a reasonable jury to infer its intent to resume use of its Bukhara mark for restaurants. As such, these communications, even when viewed in the light most favorable to ITC, do not give rise to a material question of fact on the issue of ITC's intent to resume use of its registered mark.
 
 
 50
 ITC submits that record evidence also reveals its negotiations to expand the Bukhara restaurant brand into Starwood hotels. The proffered evidence consists of (1) a 2002 letter from Starwood's Asia-Pacific headquarters indicating a general interest in operating Bukhara restaurants in some of its hotels outside India, and (2) a 2004 story from an Indian newspaper about ITC's intent to open Bukhara restaurants in London and Tokyo. Neither document references the possible opening of a Bukhara restaurant in the United States. Moreover, both the letter and the news story post-date the 1997-2000 period of non-use that gives rise to the presumption of abandonment, and they make no mention of any intent to resume use arising during this critical time frame. Accordingly, this evidence is insufficient to raise a material issue of fact.
 
 
 51
 (4) Bukhara Restaurants Outside the United States
 
 
 52
 Finally, ITC cites La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc. to support its argument that the continued operation of its Bukhara restaurants outside the United States demonstrates "an ongoing program to exploit the mark commercially," giving rise to an inference of an intent to resume the mark's use in this country, 495 F.2d 1265, 1272 (2d Cir.1974). In fact, ITC's reliance on Societe Anonyme is misplaced. In that case, this court ruled that a "meager trickle" of perfume sales within the United States—89 bottles sold over a period of 20 years—was insufficient to establish trademark rights in the United States. Id. Nothing in that case suggests that ongoing foreign use of a mark, by itself, supports an inference that the owner intends to re-employ a presumptively abandoned mark in the United States. Cf. id. at 1271 n. 4 (noting "well-settled" view "that foreign use is ineffectual to create trademark rights in the United States"). Indeed, we identify no authority supporting that conclusion.
 
 
 53
 Accordingly, like the district court, we conclude that ITC's continued foreign use of the Bukhara mark for restaurants does not raise a material issue of fact regarding its intent to resume similar use of the mark in the United States. Because ITC plainly abandoned its right to the Bukhara mark for restaurant services in the United States, we affirm the award of summary judgment in favor of defendants on ITC's federal and state infringement claims.
 
 C. Unfair Competition
 
 54
 1. Federal Claim Under Section 43(a)(1)(A) of the Lanham Act
 
 
 55
 ITC claims that defendants violated section 43(a)(1)(A) of the Lanham Act by engaging in unfair competition in the use of its Bukhara mark and its related trade dress.[13] Section 43(a)(1)(A) allows the producer of a product or service to initiate a cause of action against a person who uses "any word, term name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion . . . as to the origin, sponsorship, or approval of [the producer's] . . . services." 15 U.S.C. § 1125(a)(1)(A). This protection is broader than that afforded by section 32(1)(a), which prohibits only infringement of marks actually registered with the Patent and Trademark Office. See Two Pesos v. Taco Cabana, 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) ("Section 43(a) prohibits a broader range of practices than does § 32, which applies to registered marks, but it is common ground that § 43(a) protects qualifying unregistered trademarks" (internal citations and quotation marks omitted)); accord Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir.2002).
 
 
 56
 To succeed on a section 43(a)(1)(A) claim, a plaintiff must prove (1) that the mark or dress is distinctive as to the source of the good or service at issue, and (2) that there is the likelihood of confusion between the plaintiff's good or service and that of the defendant. See Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 115 (2d Cir.2001) (citing Wal-Mart Stores, Inc. v. Samara Bros., 529 U.S. 205, 210, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000)); see also Two Pesos v. Taco Cabana, 505 U.S. at 768, 112 S.Ct. 2753; Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 115 (2d Cir.2006). Preliminary to making this showing, however, a plaintiff must demonstrate its own right to use the mark or dress in question. See Planetary Motion, Inc. v. Techsplosion, Inc., 261 F.3d 1188, 1193 (11th Cir.2001) (stating that plaintiff must show "that it had prior rights to the mark at issue" in order to prevail in a section 43(a) claim); Exxon Corp. v. Humble Exploration Co., 695 F.2d 96, 103 (5th Cir.1983) (stating that where a section 43(a) claim is based on alleged ownership of a mark, it is necessary to consider "[w]hether the mark has been abandoned" before considering merits of claim); P. Daussa Corp. v. Sutton Cosmetics (P. R.), Inc., 462 F.2d 134, 136 (2d Cir.1972) ("To be entitled to relief, however, [plaintiff] must show not only confusing similarity, but priority of right over [defendant] to the use of the [plaintiff's] mark.").
 
 
 57
 In light of our conclusion that, as a matter of law, ITC abandoned its registered Bukhara mark as of August 28, 2000, ITC confronts a high hurdle in demonstrating that, at the time of defendants' challenged actions, it possessed a priority right to the use of the Bukhara mark and related trade dress for restaurants in the United States. See Vais Arms, Inc. v. Vais, 383 F.3d at 292 n. 8 (noting that "abandonment results in a break in the chain of priority") (quoting 2 McCarthy, supra, § 17:4); Emergency One, Inc. v. American Fire Eagle Engine Co., 332 F.3d 264, 268 (4th Cir.2003) ("The priority to use a mark . . . can be lost through abandonment."); see also Exxon Corp. v. Humble Exploration Co., 695 F.2d at 103-04 (observing that it would be "incongruous" to allow plaintiff who had abandoned mark to successfully sue defendant for false designation or representation of origin). To clear this hurdle, ITC invokes the famous marks doctrine. It submits that, because (1) since 1977, it has continuously used its Bukhara mark and trade dress outside the United States; and (2) that mark was renowned in the United States before defendants opened their first Bukhara Grill restaurant in New York in 1999, it has a priority right to the mark sufficient to claim section 43(a)(1)(A) protection in this country.
 
 
 58
 To explain why we disagree, we begin by discussing the principle of trademark territoriality. We then discuss the famous marks exception to this principle and the international treaties, implementing legislation, and policy concerns relied on by ITC in urging the application of this exception to this case.
 
 
 59
 a. The Territoriality Principle
 
 
 60
 The principle of territoriality is basic to American trademark law. See American Circuit Breaker Corp. v. Or. Breakers, Inc., 406 F.3d 577, 581 (9th Cir. 2005); Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700, 714 (3d Cir.2004); Buti v. Impressa Perosa, S.R.L., 139 F.3d 98, 103 (2d Cir.1998); Person's Co. v. Christman, 900 F.2d 1565, 1568-69 (Fed.Cir.1990). As our colleague, Judge Leval, has explained, this principle recognizes that
 
 
 61
 a trademark has a separate legal existence under each country's laws, and that its proper lawful function is not necessarily to specify the origin or manufacture of a good (although it may incidentally do that), but rather to symbolize the domestic goodwill of the domestic markholder so that the consuming public may rely with an expectation of consistency on the domestic reputation earned for the mark by its owner, and the owner of the mark may be confident that his goodwill and reputation (the value of the mark) will not be injured through use of the mark by others in domestic commerce.
 
 
 62
 Osawa & Co. v. B & H Photo, 589 F.Supp. 1163, 1171-72 (S.D.N.Y.1984).[14]
 
 
 63
 Precisely because a trademark has a separate legal existence under each country's laws, ownership of a mark in one country does not automatically confer upon the owner the exclusive right to use that mark in another country. Rather, a mark owner must take the proper steps to ensure that its rights to that mark are recognized in any country in which it seeks to assert them. Cf. Barcelona.com, Inc. v. Excelentisimo Ayuntamiento De Barcelona, 330 F.3d 617, 628 (4th Cir.2003) ("United States courts do not entertain actions seeking to enforce trademark rights that exist only under foreign law."); E. Remy Martin & Co., S.A. v. Shaw-Ross Int'l Imports, Inc., 756 F.2d 1525, 1531 (11th Cir.1985) ("Our concern must be the business and goodwill attached to United States trademarks, not French trademark rights under French law." (internal quotation marks omitted)).
 
 
 64
 As we have already noted, United States trademark rights are acquired by, and dependent upon, priority of use. See supra at 146-47 The territoriality principle requires the use to be in the United States for the owner to assert priority rights to the mark under the Lanham Act. See Buti v. Impressa Perosa, S.R.L., 139 F.3d at 103 (noting that "Impressa's registration and use of the Fashion Café name in Italy has not, given the territorial nature of trademark rights, secured it any rights in the name under the Lanham Act"); La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc., 495 F.2d at 1271 n. 4 ("It is well-settled that foreign use is ineffectual to create trademark rights in the United States."); see also Le Blume Import Co. v. Coty, 293 F. 344, 350 (2d Cir.1923) (observing that "the protection of a trade-mark in the United States is not to be defeated by showing a prior use of a like trademark in France, or in some other foreign country" so long as "the one claiming protection is able to show that he was first to use it in this country"); cf. Grupo Gigante S.A. De C.V. v. Dallo & Co., 391 F.3d 1088, 1093 (9th Cir.2004) (stating general proposition that "priority of trademark rights in the United States depends solely upon priority of use in the United States, not on priority of use anywhere in the world," although recognizing famous marks doctrine as an exception to territoriality principle (quoting 4 McCarthy, supra, § 29:2, at 29-6)). But see International Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco, 329 F.3d 359, 381 (4th Cir.2003) (concluding that United States trademark rights can be acquired merely through advertising in the United States combined with rendering of services abroad to American customers). Thus, absent some use of its mark in the United States, a foreign mark holder generally may not assert priority rights under federal law, even if a United States competitor has knowingly appropriated that mark for his own use. See Person's Co. v. Christman, 900 F.2d at 1569-70 (holding that foreign use is not sufficient to establish priority rights even over a United States competitor who took mark in bad faith).
 
 
 65
 b. The Famous Marks Doctrine as an Exception to the Territoriality Principle
 
 
 66
 ITC urges us to recognize an exception to the territoriality principle for those foreign marks that, even if not used in the United States by their owners, have achieved a certain measure of fame within this country.
 
 
 67
 (1)Origin of the Famous Marks Doctrine
 
 
 68
 The famous marks doctrine is no new concept. It originated in the 1925 addition of Article 6bis to the Paris Convention for the Protection of Industrial Property, Mar. 20, 1883, as rev. at Stockholm, July 14, 1967, 21 U.S.T. 1583, 828 U.N.T.S. 305 ("Paris Convention"). Article 6bis, which by its terms applies only to trademarks, requires member states
 
 
 69
 ex officio if their legislation so permits, or at the request of an interested party, to refuse or to cancel the registration, and to prohibit the use, of a trademark which constitutes a reproduction, an imitation, or a translation, liable to create confusion, of a mark considered by the competent authority of the country of registration or use to be well known in that country as being already the mark of a person entitled to the benefits of this Convention and used for identical or similar goods. These provisions shall also apply when the essential part of the mark constitutes a reproduction of any such well-known mark or an imitation liable to create confusion therewith.
 
 
 70
 Paris Convention, art. 6bis.[15] One commentator has observed that the "purpose" of Article 6bis "is to avoid the registration and use of a trademark, liable to create confusion with another mark already well known in the country of such registration or use, although the latter well-known mark is not, or not yet, protected in that country by a registration which would normally prevent the registration or use of the conflicting mark." G.H.C. Bodenhausen, Guide to the Application of the Paris Convention for the Protection of Industrial Property 90 (1968).
 
 
 71
 (2) The Famous Marks Doctrine in the United States
 
 
 72
 (a) State Common Law
 
 
 73
 The famous marks doctrine appears first to have been recognized in the United States by a New York trial court in a common law action for unfair competition in the use of a trademark. See Maison Prunier v. Prunier's Rest. & Café, 159 Misc. 551, 557-58, 288 N.Y.S. 529, 535-36 (N.Y.Sup.Ct.1936). The owner of "Maison Prunier," a Paris restaurant with a branch in London, sought to enjoin defendants' operation of a New York City restaurant named "Prunier's Restaurant and Café." The New York restaurant had apparently adopted both the Paris restaurant's name and slogan ("Tout ce qui vient de la mer"[16]) and boldly advertised itself as "The Famous French Sea Food Restaurant." While the French plaintiff conceded that it had never operated a restaurant in the United States, it nevertheless sought relief for the unauthorized use of its name and mark under the common law of unfair competition.
 
 
 74
 In ruling in favor of the plaintiff, the trial court first observed that "the right of a French corporation to sue here for protection against unfair competition was expressly granted in [Article 10bis of] the [Paris] convention between the United States and various other powers for the protection of industrial property." Id. at 554, 288 N.Y.S. at 532.[17] It then ruled that "actual competition in a product is not essential to relief under the doctrine of unfair competition." Id. at 555, 288 N.Y.S. at 533. The plaintiff was entitled to protection from "`any injury which might result to it from the deception of the public through the unauthorized use of its trade name, or a trade name which would lead the public to believe that it was in some way connected with the plaintiff.'" Id. at 556, 288 N.Y.S. at 534 (quoting Long's Hat Stores Corp. v. Long's Clothes, Inc., 224 A.D. 497, 498, 231 N.Y.S. 107, 107 (1st Dep't 1928)). Although the court acknowledged the general rule of territoriality, see id. at 557, 288 N.Y.S. 529, 288 N.Y.S. at 535 (noting no "right to protection against the use of a trade-mark or trade name beyond the territory in which it operates"), it recognized an exception to the rule where the second user was guilty of bad faith, see id. at 557-58, 288 N.Y.S. at 536-37. The court identified the fame of the mark as a factor relevant to deciding whether the second user had, in good faith, made use of a mark without knowing of its prior use by another party. See id. at 559, 288 N.Y.S. at 537. The Prunier court concluded that the French plaintiff was entitled to protection against unfair competition because its trademark enjoyed "wide repute" and the facts of the case indicated a total lack of good faith on the part of the defendants. Id. at 559, 288 N.Y.S. at 537. The basis of this holding, it should be noted, was not Article 6bis of the Paris Convention. Instead, the holding was based entirely on New York common law principles of unfair competition.
 
 
 75
 More than twenty years later, in Vaudable v. Montmartre, Inc., 20 Misc.2d 757, 193 N.Y.S.2d 332 (N.Y.Sup.Ct.1959), another New York trial court granted a different Paris restaurant, "Maxim's," injunctive relief against a New York City restaurant that had appropriated its name, decor, and distinctive script style, all without permission. The court concluded that the lack of direct competition between the two restaurants was "immaterial" to a common law claim for unfair competition. Id. at 759, 193 N.Y.S.2d at 335. The only relevant question was whether "there had been a misappropriation, for the advantage of one person, of a property right belonging to another." Id. at 759, 193 N.Y.S.2d at 335. Noting that the Paris Maxim's had been in continuous operation since 1946, when it reopened after World War II, the court concluded that its owners had priority rights as against the junior American user by virtue of (1) their uninterrupted use of the mark abroad, and (2) the fame of the "Maxim's" mark among "the class of people residing in the cosmopolitan city of New York who dine out." Id. at 758, 193 N.Y.S.2d at 334.
 
 
 76
 (b) Federal Actions
 
 
 77
 (i) Trademark Board Rulings
 
 
 78
 A quarter century later, the federal Trademark Trial and Appeal Board ("Trademark Board") invoked Vaudable's recognition of the famous marks doctrine in several inter partes proceedings.[18] In Mother's Rests., Inc. v. Mother's Other Kitchen, Inc., the Trademark Board stated in dictum that:
 
 
 79
 [I]t is our view that prior use and advertising of a mark in connection with goods or services marketed in a foreign country (whether said advertising occurs inside or outside the United States) creates no priority rights in said mark in the United States as against one who, in good faith, has adopted the same or similar mark for the same or similar goods or services in the United States prior to the foreigner's first use of the mark on goods or services sold and/or offered in the United States at least unless it can be shown that the foreign party's mark was, at the time of the adoption and first use of a similar mark by the first user in the United States, a "famous" mark within the meaning of Vaudable v. Montmartre, Inc.
 
 
 80
 218 U.S.P.Q 1046, * 8 (T.T.A.B.1983) (concluding that customers would be likely to confuse the "Mother's Pizza Parlour" trademark with the "Mother's Other Kitchen" trademark) (internal citation omitted).
 
 
 81
 That same year, the Trademark Board applied the same reasoning in All England Lawn Tennis Club, Ltd. v. Creations Aromatiques, 220 U.S.P.Q. 1069 (1983), granting plaintiff's request to block registration of a trademark for "Wimbledon Cologne" even though plaintiff was not itself using the Wimbledon mark on any product sold in the United States. The Trademark Board observed that the Wimbledon mark had "acquired fame and notoriety as used in association with the annual championships within the meaning of Vaudable" and that "purchasers of applicant's cologne would incorrectly believe that said product was approved by or otherwise associated with the Wimbledon tennis championships and that allowance of the application would damage opposer's rights to the mark." Id. at * 10.
 
 
 82
 Recently, the Trademark Board has reiterated in dicta that owners of well known foreign marks need not use those marks in the United States to challenge the registration of marks likely to promote confusion on the part of consumers. See, e.g., First Niagara Ins. Brokers, Inc. v. First Niagara Fin. Group, Inc., 77 U.S.P.Q.2d 1334, *30-31 (2005), overruled on other grounds by First Niagara Ins. Brokers, Inc. v. First Niagara Fin. Group, Inc., 476 F.3d 867 (Fed.Cir. Jan. 9, 2007), 2007 U.S.App. LEXIS 367.
 
 
 83
 As this court has frequently observed, Trademark Board decisions, "while not binding on courts within this Circuit, are nevertheless `to be accorded great weight'" under general principles of administrative law requiring deference to an agency's interpretation of the statutes it is charged with administering. Buti v. Impressa Perosa S.R.L., 139 F.3d at 105 (quoting Murphy Door Bed Co. v. Interior Sleep Sys., Inc., 874 F.2d 95, 101 (2d Cir. 1989)); see also In re Dr Pepper Co., 836 F.2d 508, 510 (Fed.Cir.1987). In applying this principle to this case, however, we identify a significant concern: nowhere in the three cited rulings does the Trademark Board state that its recognition of the famous marks doctrine derives from any provision of the Lanham Act or other federal law. Indeed, the federal basis for the Trademark Board's recognition of the famous marks doctrine is never expressly stated. Its reliance on Vaudable suggests that recognition derives from state common law. At least one Trademark Board member, however, has questioned whether state common law can support recognition of the famous marks doctrine as a matter of federal law:
 
 
 84
 [I]t seems to me that the Vaudable decision according protection to the famous Maxim's restaurant in the United States . . . is inapplicable in this case since that decision was based on a theory of unfair competition, namely misappropriation, under the law of the State of New York. Under Federal law, it seems to me that application of the well-known marks doctrine depends on whether the applicable text of the Paris Convention . . . and, in particular, Article 6bis of that Convention, is self-executing [so as to become part of federal law].
 
 
 85
 Mother's Rests., Inc. v. Mother's Other Kitchen, Inc., 218 U.S.P.Q 1046, *21 (Allen, concurring in part, dissenting in part) (internal citations omitted). Because we conclude that the Trademark Board's reliance on state law to recognize the famous marks doctrine falls outside the sphere to which we owe deference, we consider de novo the question of that doctrine's existence within federal trademark law.
 
 
 86
 (ii) Federal Case Law
 
 
 87
 To date, the Ninth Circuit Court of Appeals is the only federal appeals court to have recognized the famous marks doctrine as a matter of federal law. See Grupo Gigante S.A. De C.V. v. Dallo & Co., 391 F.3d at 1088; cf. International Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Estrangers a Monaco, 329 F.3d at 389 n. 9 (Motz, J., dissenting) (noting that the famous marks doctrine has been applied so infrequently that its viability is uncertain). In Grupo Gigante, 391 F.3d at 1088, the Ninth Circuit considered whether the "Gigante" mark—registered and used by a large chain of grocery stores in Mexico since 1963—was sufficiently well known among Mexican-Americans in Southern California to afford it priority over a competing "Gigante" mark used by a separate chain of Los Angeles grocery stores. In resolving this question, the court ruled:
 
 
 88
 [T]here is a famous mark exception to the territoriality principle. While the territoriality principle is a long-standing and important doctrine within trademark law, it cannot be absolute. An absolute territoriality rule without a famous-mark exception would promote consumer confusion and fraud. Commerce crosses borders. In this nation of immigrants, so do people. Trademark is, at its core, about protecting against consumer confusion and "palming off." There can be no justification for using trademark law to fool immigrants into thinking that they are buying from the store they liked back home.
 
 
 89
 Id. at 1094 (footnotes omitted).
 
 
 90
 In Grupo Gigante, the Ninth Circuit did not reference either the language of the Lanham Act nor Article 6bis of the Paris Convention to support recognition of the famous marks doctrine. Indeed, elsewhere in its opinion, the court specifically stated that the Paris Convention creates no "additional substantive rights" to those provided by the Lanham Act. Id. at 1100. The court also acknowledged that the famous marks doctrine is not recognized by California state law. See id. at 1101 (observing that cases cited by plaintiff "provide no support for the conclusion that use anywhere in the world suffices to establish priority in California"). Thus, it appears that the Ninth Circuit recognized the famous marks doctrine as a matter of sound policy: "An absolute territoriality rule without a famous marks exception would promote customer confusion and fraud." Id. at 1094.
 
 
 91
 This court has twice referenced the famous marks doctrine, but on neither occasion were we required to decide whether it does, in fact, provide a legal basis for acquiring priority rights in the United States for a foreign mark not used in this country. See Buti v. Impressa Perosa, S.R.L., 139 F.3d at 104 n. 2 (referencing Mother's Restaurant and Vaudable but, in the end, concluding that famous marks doctrine "has no application here given that Impressa has made no claim under that doctrine"); see also Empresa Cubana del Tabaco v. Culbro Corp., 399 F.3d at 481 (declining to decide whether famous marks doctrine should be recognized because "even assuming that the famous marks doctrine is otherwise viable and applicable, the [Cuban] embargo bars [plaintiff] from acquiring property rights in the . . . mark through the doctrine").[19]
 
 
 92
 District courts in this Circuit have reached varying conclusions about the applicability of the famous marks doctrine to Lanham Act claims. In Emmpresa Cubana Del Tabaco v. Culbro Corp., 213 F.Supp.2d at 283-84, Judge Sweet concluded that the rights identified in Article 6bis of the Paris Convention could not be pursued in a section 44(h) claim, but could be pursued under section 44(b).[20] In an unpublished 2005 decision, De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc., 2005 WL 1164073 (S.D.N.Y. May 18, 2005), 2005 U.S. Dist. LEXIS 9307, Judge Cote characterized the famous marks doctrine as a "controversial common law exception to the territoriality principle," id. at *21. Nevertheless, she concluded that rights obtained by the operation of the doctrine at common law could be asserted in a federal unfair competition action filed under section 43(a) of the Lanham Act. See id. at *25-26; see also De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc., 440 F.Supp.2d 249 (S.D.N.Y.2006).
 
 
 93
 That same year, in Almacenes Exito S.A. v. El Gallo Meat Market, Inc., Judge Rakoff reached a different conclusion, ruling that "[t]o the extent the famous marks doctrine is a creature of common law it may support state causes of action, but it has no place in federal law where Congress has enacted a statute, the Lanham Act, that carefully prescribes the bases for federal trademark claims," 381 F.Supp.2d 324, 326-27 (S.D.N.Y.2005) (internal citation omitted). Identifying the territoriality principle as a "bedrock principle of federal trademark law," id. at 326, Judge Rakoff concluded that recognition of a famous marks exception represented "such a radical change in basic federal trademark law" that it could "only be made by Congress, not by the courts," id. at 328. He specifically rejected the argument advanced here by ITC, i.e., that the Lanham Act itself recognizes a famous marks exception by providing a foreign plaintiff with substantive rights identified in Article 6bis. He observed that "the Paris Convention, as incorporated by the Lanham Act, only requires `national treatment.'" Id. at 328 (internal quotation marks omitted). We agree with this analysis for reasons discussed in the next two lettered subsections of this opinion.
 
 
 94
 (c) Treaties Protecting Famous Marks and United States Implementing Legislation
 
 
 95
 ITC insists that Article 6bis of the Paris Convention, together with Article 16(2) of the Agreement on Trade-Related Aspects of Intellectual Property Rights ("TRIPs"), see Uruguay Round Agreements Act, Pub.L. No. 103-465, 108 Stat. 4809 (1994) (codified as amended at scattered sections of United States Code), provides legal support for its claim to famous marks protection. As previously noted, Article 6bis provides for member states to the Paris Convention, upon the request of an interested party,
 
 
 96
 to prohibit the use of a trademark which constitutes a reproduction, an imitation, or a translation, liable to create confusion, of a mark considered by the competent authority of the country of registration or use to be well known in that country as being already the mark of a person entitled to the benefits of this Convention and used for identical or similar goods.
 
 
 97
 Paris Convention, art. 6bis. Further, TRIPs Article 16(2) extends Article 6bis to service marks, see supra at 156 n. 15.
 
 
 98
 At the outset, we observe that ITC does not specifically contend that these two treaty articles are self-executing.[21] While Vanity Fair Mills v. T. Eaton Co., 234 F.2d 633 (2d Cir.1956), might support such an argument with respect to Article 6bis protection of trademarks, see id. at 640 (observing in dictum that, upon ratification by Congress, the Paris Convention required "no special legislation in the United States . . . to make [it] effective here"),[22] no similar conclusion can extend to Article 16(2) protection of service marks because TRIPs is plainly not a self-executing treaty. See In re Rath, 402 F.3d 1207, 1209 n. 2 (Fed.Cir.2005); see also S.Rep. No. 103-412, at 13 (1994) (accompanying the Uruguay Round Agreements Act, Pub.L. No. 103-465, 108 Stat. 4809 (1994)) (stating that TRIPs and other GATT agreements "are not self-executing and thus their legal effect in the United States is governed by implementing legislation"). While Congress has amended numerous federal statutes to implement specific provisions of the TRIPs agreement, it appears to have enacted no legislation aimed directly at Article 16(2).[23]
 
 
 99
 ITC nevertheless submits that Lanham Act sections 44(b) and (h) effectively incorporate the protections afforded famous marks by the Paris Convention and TRIPs.[24] Appellant's Br. at 14-16 & n. 2. ITC's argument is, however, at odds with this court's 2005 ruling in Empresa Cubana del Tabaco v. Culbro Corporation, 399 F.3d 462. In that case, we expressly held that the Paris Convention creates no substantive United States rights beyond those independently provided in the Lanham Act:
 
 
 100
 "As other courts of appeals have noted, the rights articulated in the Paris Convention do not exceed the rights conferred by the Lanham Act. Instead, we conclude that the Paris Convention, as incorporated by the Lanham Act, only requires `national treatment.'
 
 
 101
 National treatment means that foreign nationals should be given the same treatment in each of the member countries as that country makes available to its own citizens. So, section 44 of the Lanham Act gives foreign nationals the same rights and protections provided to United States citizens by the Lanham Act.
 
 
 102
 Id. at 485 (emphasis added) (quoting International Café, S.A.L. v. Hard Rock Café Int'l, Inc., 252 F.3d 1274, 1277-78 (11th Cir.2001) but omitting internal citations); see also Grupo Gigante S.A. De C.V. v. Dallo & Co., 391 F.3d at 1100 (stating that Paris Convention creates no "additional substantive rights" to those provided by Lanham Act). Although this statement was made in the context of a claim asserting substantive rights under Article 10bis of the Paris Convention, the reasoning applies with equal force to claimed famous marks protection under Article 6bis and TRIPs Article 16(2) because no famous marks rights are independently afforded by the Lanham Act. See Almacenes Exito S.A. v. El Gallo Meat Mkt., 381 F.Supp.2d at 327-28.
 
 
 103
 In reaching this conclusion, we are mindful that one leading commentator urges otherwise. See 4 McCarthy, supra, § 29:4, at 29-20; see also Empresa Cubana del Tabaco v. Culbro Corp., 399 F.3d at 480 (recognizing McCarthy's view of famous marks doctrine without deciding its correctness). McCarthy concludes that "both the TRIPs Agreement and the Paris Convention Article 6bis require the United States to recognize rights" in famous foreign marks, even if they have not been registered or used in the United States. See 4 McCarthy, supra, § 29:62, at 29-167. "In the author's view, this international obligation is enforced in the United States by Lanham Act § 44(b) and § 44(h)." Id.; see also id. § 29:4, at 29-20-21. McCarthy appears to construe the statutory "entitle[ment] to effective protection against unfair competition," conferred by section 44(h), to create a federal right to famous marks protection "`coextensive with the substantive provisions'" of Articles 6bis and 16(2). Id., § 29:4, at 29-21 (quoting Toho Co. v. Sears, Roebuck & Co., 645 F.2d 788, 793 (9th Cir.1981)). We cannot agree.
 
 
 104
 First, we do not think Toho is helpful in determining whether Congress intended to incorporate into the Lanham Act a famous marks exception to the principle of trademark territoriality. The treaty at issue in that case was not the Paris Convention or TRIPs, but a Treaty of Friendship, Commerce and Navigation between the United States and Japan. See Toho Co. v. Sears, Roebuck & Co., 645 F.2d at 792 (citing Treaty of Friendship, Commerce and Navigation, United States-Japan, Apr. 2, 1953, 4 U.S.T.2063). Further, the right at issue was not United States priority for a foreign mark not used in this country, but a foreign company's right to United States protection against unfair competition for a mark that it did use in this country. See id. at 789-90 (describing use of "Godzilla" mark in the United States). Even though the Ninth Circuit concluded that, in such circumstances, the foreign mark holder was entitled to the same rights as a domestic counterpart, it did not afford the foreign mark holder any right not already provided in the Lanham Act. Rather, it concluded that "the practical effect of section 44 and [the Treaty of Friendship, Navigation and Commerce] is to provide a federal forum in which Toho can pursue its state claims." Id. at 793.[25]
 
 
 105
 Second, and more important, we do not ourselves discern in the plain language of sections 44(b) and (h) a clear congressional intent to incorporate a famous marks exception into federal unfair competition law. Section 44(b) guarantees foreign mark holders only "the benefits of this section . . . to the extent necessary to give effect to any . . . convention, treaty or reciprocal law," as well as the "rights to which any owner of a mark is otherwise entitled by this chapter." 15 U.S.C. § 1126(b) (emphasis added). In short, whatever protections Article 6bis and Article 16(2) might contemplate for famous marks, section 44(b) grants foreign mark holders covered by these treaties only those protections of United States law already specified in the Lanham Act. See Empresa Cubana del Tabaco v. Culbro Corp., 399 F.3d at 485. The Lanham Act's unfair competition protections, as we have already explained, are cabined by the long-established principle of territoriality. See supra at 154-56.
 
 
 106
 To the extent Section 44(h) references an "entitle[ment] to effective protection against unfair competition," 15 U.S.C. § 1126(h), our precedent precludes us from construing this phrase to afford foreign mark holders any rights beyond those specified in section 44(b). See Havana Club Holding, S.A. v. Galleon S.A., 203 F.3d 116, 134 (2d Cir.2000) (characterizing the "[r]ights under section 44(h)" as "co-extensive with treaty rights under section 44(b), including treaty rights relating to . . . the repression of unfair competition" (internal quotation marks omitted)); see also American Auto. Ass'n v. Spiegel, 205 F.2d 771, 774 (2d Cir.1953) ("Since [section 44(h)] is limited to `person[s] designated in subsection (b),' we look to that subsection to learn its scope.").
 
 
 107
 We further note that, in section 44(d) of the Lanham Act, Congress detailed circumstances under which the holders of foreign registered marks can claim priority rights in the United States, notably including among those circumstances actual or intended use in the United States within a specified time. See 15 U.S.C. § 1126(d) (affording United States priority rights from date of foreign registration if, inter alia, application for United States registration is filed within six months along with a statement of bona fide intent to use marks in commerce, but denying mark holder right to sue for acts committed prior to United States registration unless registration based on actual use in commerce[26]). Congress's specificity in dealing with registered marks cautions against reading a famous marks exception into sections 44(b) and (h), which nowhere reference the doctrine, much less the circumstances under which it would appropriately apply despite the fact that the foreign mark was not used in this country. We are mindful that Congress has not hesitated to amend the Lanham Act to effect its intent with respect to trademark protection, having done so almost thirty times since the statute took effect in 1947. See 1 McCarthy, supra, §§ 5:5-11, at 5-13-22.[27] In light of these legislative efforts, the absence of any statutory provision expressly incorporating the famous marks doctrine or Articles 6bis and 16(2) is all the more significant. Before we construe the Lanham Act to include such a significant departure from the principle of territoriality, we will wait for Congress to express its intent more clearly.
 
 
 108
 (d) Policy Rationales Cannot, by Themselves, Support Judicial Recognition of the Famous Marks Doctrine Under Federal Law
 
 
 109
 Even if the Lanham Act does not specifically incorporate Article 6bis and Article 16(2) protections for famous foreign marks, ITC urges this court to follow the Ninth Circuit's lead and to recognize the famous marks doctrine as a matter of sound policy. See Grupo Gigante S.A. De C.V. v. Dallo & Co., 391 F.3d at 1094 (recognizing famous marks doctrine because "[t]here can be no justification for using trademark law to fool immigrants into thinking that they are buying from the store they liked back home"). ITC argues that the United States cannot expect other nations to protect famous American trademarks if United States courts decline to afford reciprocal protection to famous foreign marks.
 
 
 110
 We acknowledge that a persuasive policy argument can be advanced in support of the famous marks doctrine. See, e.g., De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc., 2005 U.S. Dist. LEXIS 9307, at *25 (noting that "[r]ecognition of the famous marks doctrine is particularly desirable in a world where international travel is commonplace and where the Internet and other media facilitate the rapid creation of business goodwill that transcends borders"); Frederick W. Mostert, Well-Known and Famous Marks: Is Harmony Possible in the Global Village?, 86 Trademark Rep. 103, 106 (1996) (arguing that "protection of the global trading system through the prevention of piracy and unfair exploitation of well-known marks has become essential"). The fact that a doctrine may promote sound policy, however, is not a sufficient ground for its judicial recognition, particularly in an area regulated by statute. See, e.g., Badaracco v. Comm'r, 464 U.S. 386, 398, 104 S.Ct. 756, 78 L.Ed.2d 549 (1984) ("The relevant question is not whether, as an abstract matter, the rule advocated by petitioners accords with good policy. The question we must consider is whether the policy petitioners favor is that which Congress effectuated by its enactment of [the statute]."). In light of the comprehensive and frequently modified federal statutory scheme for trademark protection set forth in the Lanham Act, we conclude that any policy arguments in favor of the famous marks doctrine must be submitted to Congress for it to determine whether and under what circumstances to accord federal recognition to such an exception to the basic principle of territoriality. See Almacenes Exito S.A. v. El Gallo Meat Mkt., Inc., 381 F.Supp.2d at 326-28. Absent such Congressional recognition, we must decline ITC's invitation to grant judicial recognition to the famous marks doctrine simply as a matter of sound policy.
 
 
 111
 For all these reasons, we affirm the district court's award of summary judgment in favor of defendants on ITC's federal unfair competition claim.
 
 
 112
 2. State Common Law Claim for Unfair Competition
 
 
 113
 a. ITC's Reliance on the Famous Marks Doctrine to Sue for Unfair Competition Under New York Law
 
 
 114
 ITC submits that, even if we affirm the district court's dismissal of its federal unfair competition claim, we must reverse the dismissal of its parallel state law claim. As it correctly observes, New York common law allows a plaintiff to sue for unfair competition where a "property right or a commercial advantage" has been "misappropriated." Flexitized, Inc. v. National Flexitized Corp., 335 F.2d 774, 781-82 (2d Cir.1964). Nevertheless, in light of ITC's abandonment of the Bukhara mark and dress for restaurants in the United States, its common law assertion of a "property right or a commercial advantage" in these designations based on their foreign use depends on whether New York recognizes the famous marks doctrine in the circumstances here at issue.
 
 
 115
 As we have already noted, at least two New York cases indicate such recognition as a general matter: Vaudable v. Montmartre, Inc., 20 Misc.2d 757, 193 N.Y.S.2d 332, and Maison Prunier v. Prunier's Rest. & Café, 159 Misc. 551, 288 N.Y.S. 529. Neither the New York Court of Appeals nor any intermediate New York appellate court, however, has ever specifically adopted the views expressed in Prunier and Vaudable to accord common law protection to the owners of famous marks. Moreover, no New York court has clearly delineated a standard for determining when a mark becomes sufficiently famous to warrant protection. "In the absence of authoritative law from the state's highest court, we must either (1) predict how the New York Court of Appeals would resolve the state law question, or, if state law is so uncertain that we can make no reasonable prediction, (2) certify the question to the New York Court of Appeals for a definitive resolution." DiBella v. Hopkins, 403 F.3d 102, 111 (2d Cir.2005). In this case, we opt for certification.
 
 
 116
 b. Certifying the Question of New York's Common Law Recognition of the Famous Marks Doctrine
 
 
 117
 (1) Standard for Certification
 
 
 118
 New York law and Second Circuit Local Rule § 0.27 permit us to certify to the New York Court of Appeals "determinative questions of New York law [that] are involved in a case pending before [us] for which no controlling precedent of the Court of Appeals exists." N.Y. Comp. Codes R. & Regs. tit. 22, § 500.27(a). In deciding whether to certify a question, we consider, inter alia, "(1) the absence of authoritative state court interpretations of the [law in question]; (2) the importance of the issue to the state, and whether the question implicates issues of state public policy; and (3) the capacity of certification to resolve the litigation." Morris v. Schroder Capital Mgmt. Int'l, 445 F.3d 525, 531 (2d Cir.2006) (internal quotation marks omitted).
 
 
 119
 (2) Certified Question 1: Does New York Recognize the Famous Marks Doctrine?
 
 
 120
 In this case, we conclude that these factors weigh in favor of certifying the question of New York's recognition of the famous marks doctrine. First, the only New York cases to address the question of whether state common law recognizes the famous marks doctrine, Vaudable and Prunier, are decades-old trial court decisions. While these decisions are routinely cited by non-New York courts as accurate statements of the state's common law of unfair competition,[28] and while commentators routinely identify the cases as foundational in the development of the famous marks doctrine,[29] the lack of authoritative adoption of the famous marks doctrine by New York's highest court weighs in favor of certification. Second, recognition of the famous marks doctrine as part of New York common law is plainly an important policy issue for a state that plays a pivotal role in international commerce. This factor strongly counsels in favor of our soliciting the views of the New York Court of Appeals. See generally Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (observing that property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law"). Finally, certification will conclusively resolve the question of whether ITC's state unfair competition claim was, in fact, properly dismissed.
 
 
 121
 Accordingly, we certify the following question to the New York Court of Appeals: "Does New York common law permit the owner of a famous mark or trade dress to assert property rights therein by virtue of the owner's prior use of the mark or dress in a foreign country?"
 
 
 122
 (3) Certified Question 2: How Famous Must a Mark Be to Come Within the Famous Marks Doctrine?
 
 
 123
 If the New York Court of Appeals were to answer the first certified question in the affirmative, we ask it to consider a second query: "How famous must a foreign mark or trade dress be to permit its owner to sue for unfair competition?"[30] Although we have had no prior occasion to address this question, we note the availability of a number of possible standards.
 
 
 124
 (a) Secondary Meaning
 
 
 125
 If New York were inclined to recognize a broad famous marks doctrine, the Court of Appeals might conclude that a foreign mark's acquisition of "secondary meaning" in the state was sufficient to accord it common law protection. "Secondary meaning" is a term of art referencing a trademark's ability to "`identify the source of the product rather than the product itself.'" Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. at 766 n. 4, 112 S.Ct. 2753 (quoting Inwood Labs., Inc., v. Ives Labs., Inc., 456 U.S. 844, 851 n. 11, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)); see Allied Maint. Corp. v. Allied Mech. Trades, Inc., 42 N.Y.2d 538, 545, 399 N.Y.S.2d 628, 632, 369 N.E.2d 1162 (1977) (explicating "secondary meaning" under New York law); see also Genesee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 143 n. 4 (2d Cir.1997) (identifying factors relevant to determining secondary meaning). Under this standard, a court deciding whether to accord famous marks protection would consider only whether the source of the foreign mark is well known in New York. See generally Grupo Gigante S.A. De C.V. v. Dallo & Co., 391 F.3d at 1097.
 
 
 126
 The Court of Appeals might note, however, that in Grupo Gigante the Ninth Circuit specifically rejected "secondary meaning" as the appropriate standard for application of the famous marks doctrine. That federal court explained that such an interpretation of the famous marks doctrine went "too far" because it effectively eliminated the territoriality principle that itself "has a long history in the common law." Id. at 1097-98.
 
 
 127
 (b) Secondary Meaning Plus
 
 
 128
 Instead, the Court of Appeals might consider the Ninth Circuit's compromise standard, which can be described as "secondary meaning plus." See id. at 1098 (holding that "secondary meaning is not enough"). Under this test, "where the mark has not before been used in the American market,[31] the court must be satisfied, by a preponderance of the evidence, that a substantial percentage of consumers in the relevant American market is familiar with the foreign mark." Id. (emphasis added); see also 4 McCarthy, supra, § 29:4, at 29-17 (suggesting that a "substantial" percentage of consumers in the relevant American market would be at least 50%).
 
 
 129
 Judge Graber, concurring in Grupo Gigante, emphasized the intermediate character of this standard:
 
 
 130
 I agree that a foreign owner of a supposedly famous or well-known foreign trademark must show a higher level of "fame" or recognition than that required to establish secondary meaning. Ultimately, the standard for famous or well-known marks is an intermediate one. To enjoy extraterritorial trademark protection, the owner of a foreign trademark need not show the level of recognition necessary to receive nation-wide protection against trademark dilution. On the other hand, the foreign trademark owner who does not use a mark in the United States must show more than the level of recognition that is necessary in a domestic trademark infringement case.
 
 
 131
 391 F.3d at 1106 (Graber, J., concurring).
 
 
 132
 (c) The Anti-Dilution Statute Standard
 
 
 133
 Precisely because "secondary meaning plus" is an intermediate standard, the Court of Appeals might also consider the high standard of recognition established by section 43(c) of the Lanham Act, the federal anti-dilution statute. See 15 U.S.C. § 1125(c). Under that federal law, four non-exclusive factors are relevant when determining whether a mark is sufficiently famous for anti-dilution protection:
 
 
 134
 (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties;
 
 
 135
 (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark;
 
 
 136
 (iii) The extent of actual recognition of the mark;
 
 
 137
 (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.
 
 
 138
 Id. § 1125(c)(2).
 
 
 139
 Under the federal anti-dilution statute, the holder of a mark deemed famous under this test may seek an injunction against another person who, "at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury." Id. § 1125(c)(1). ITC does not sue for dilution in this case. Nevertheless, the Court of Appeals might consider whether the factors set out in the statute provide a useful guide for defining famous marks generally.
 
 
 140
 (d) Recommendation of the World Intellectual Property Organization
 
 
 141
 Finally, should the Court of Appeals decide to articulate an entirely new and different standard of recognition for the application of the famous marks doctrine, among the factors it might consider are those identified as relevant in the non-binding "Joint Recommendation Concerning Provisions on the Protection of Well-Known Marks," adopted by the World Intellectual Property Organization in 1999:
 
 
 142
 (1) the degree of knowledge or recognition of the mark in the relevant sector of the public; (2) the duration, extent and geographical area of any use of the mark;
 
 
 143
 (3) the duration, extent and geographical area of any promotion of the mark, including advertising or publicity and the presentation, at fairs or exhibitions, or the goods and/or services to which the mark applies;
 
 
 144
 (4) the duration and geographical area of any registrations, and/or any application for registration, of the mark, to the extent that they reflect use or recognition of the mark;
 
 
 145
 (5) the record of successful enforcement of rights in the mark, in particular, the extent to which the mark was recognized as well known by competent authorities; [and]
 
 
 146
 (6) the value associated with the mark.
 
 
 147
 World Intellectual Property Organization, Joint Recommendation Concerning Provisions on the Protection of Well-Known Marks (Sept.1999), available at http:// www.wipo.int/about-ip/en/development iplaw/pub 833.htm.
 
 
 148
 We express no view as to how New York should define its state common law. We simply reserve decision on ITC's challenge to the district court's dismissal of its state common law claim for unfair competition pending the New York Court of Appeals response to our certified questions.
 
 D. The False Advertising Claim
 1. Lanham Act Section 43(a)(1)(B)
 
 149
 ITC submits that, to the extent defendants implied some affiliation between their Bukhara Grill restaurants and ITC's Bukhara products, they are guilty of false advertising under section 43(a)(1)(B) of the Lanham Act.[32] That statute states, in relevant part:
 
 
 150
 (a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
 
 
 151
 . . .
 
 
 152
 (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.
 
 
 153
 15 U.S.C. § 1125(a).
 
 
 154
 2. Standing to Complain of False Advertising
 
 
 155
 To establish standing to pursue a false advertising claim under section 43(a)(1)(B), an aggrieved party must demonstrate both (1) "`a reasonable interest to be protected against the advertiser's false or misleading claims,'" and (2) "`a reasonable basis for believing that this interest is likely to be damaged by the false or misleading advertising.'" Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship, 380 F.3d 126, 130 (2d Cir.2004) (quoting Ortho Pharm. Corp. v. Cosprophar, Inc., 32 F.3d 690, 694 (2d Cir.1994)). The "reasonable interest" prong of this test includes commercial interests, direct pecuniary interests, and even a future potential for a commercial or competitive injury. See PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1111 (2d Cir.1997) (citing Berni v. Int'l Gourmet Rests. of Am., Inc., 838 F.2d 642, 648 (2d Cir.1988)). The "reasonable basis" prong requires the plaintiff to show "`both likely injury and a causal nexus to the false advertising.'" Havana Club Holding, S.A. v. Galleon S.A., 203 F.3d at 130 (quoting Ortho Pharm. Corp. v. Cosprophar, Inc., 32 F.3d at 694).
 
 
 156
 In this case, the district court dismissed ITC's section 43(a)(1)(B) claim for lack of standing. Insofar as ITC professed a plan to open a new Bukhara restaurant in the United States, the court concluded that the plan was too ill-defined to constitute a "reasonable interest[] to be protected," particularly in light of ITC's abandonment of its registered Bukhara mark for restaurant services. See ITC Ltd. v. Punchgini, Inc., 373 F.Supp.2d at 292. To the extent ITC had attempted to market its Dal Bukhara line of packaged foods in the United States, the district court identified this as a "reasonable interest to be protected." Id. Nevertheless, it concluded that ITC had failed to adduce evidence of "a reasonable basis" for it to think that defendants' actions would likely damage this interest. See id. ITC submits that both these conclusions are erroneous. We disagree.
 
 3. ITC's Standing Claims Are Without Merit
 
 157
 a. ITC's Development and Marketing of the Dal Bukhara Line
 
 
 158
 Because defendants do not challenge the district court's conclusion that ITC's efforts to develop and market its Dal Bukhara line of packaged foods could give it a "reasonable interest to be protected," we do not review that conclusion on this appeal. We consider only whether ITC demonstrated a sufficient "reasonable basis" to think that this interest was likely to be damaged by defendants' false advertising of its New York restaurants. On appeal, ITC submits that it demonstrated the requisite reasonable basis "because Defendants' misleading statements draw direct and misleading comparisons between [themselves] and ITC's [New Delhi] Bukhara, and because ITC sells [its Dal Bukhara] food products based on the reputation of its [overseas Bukhara] restaurants." Appellants' Br. at 43. We are not persuaded.
 
 
 159
 Where a "defendant has drawn a direct comparison between its own product and that of the plaintiff, we are inclined, without much more, to find standing to bring Lanham Act claims." Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship, 380 F.3d at 130. That, however, is not this case. ITC has presented no evidence indicating that defendants ever publicly compared their Bukhara Grill restaurants to the packaged Dal Bukhara food products. Indeed, all of defendants' allegedly misleading statements were made well before ITC launched its Dal Bukhara line in 2003. Thus, we cannot agree with ITC that defendants' statements comparing Bukhara Grill to the New Delhi Bukhara are the functional equivalent of a direct comparison between defendants' restaurants and ITC's packaged food products.
 
 
 160
 Where a plaintiff's products are "not obviously in competition with the defendant's products, [and] the defendant's advertisements do not draw direct comparisons between the products," then a plaintiff must make a "more substantial showing" of "injury and causation" to satisfy the reasonable basis prong of the standing requirement. Ortho Pharm. Corp. v. Cosprophar, Inc., 32 F.3d at 694. On the record before us, we agree with the district court that ITC has failed to satisfy this burden. Specifically, ITC has produced no evidence that defendants' operation of their Bukhara Grill restaurants is likely to damage its Dal Bukhara packaged food line. As the district court aptly observed: "It stretches the limits of reason to suggest that consumers, confused as to a non-existent affiliation between ITC's canned `Dal Bukhara' [foods] and dishes served at defendants' restaurants, are likely to visit Manhattan to dine out at the `Bukhara Grill' restaurant, rather than purchasing the canned product at their local grocery store." ITC Ltd. v. Punchgini, Inc., 373 F.Supp.2d at 292.
 
 
 161
 b. Injury to ITC's Bukhara Restaurants Outside the United States
 
 
 162
 Alternatively, ITC submits that it has standing to sue defendants for false advertising because defendants' efforts to associate their Bukhara Grill establishments with ITC's Bukhara restaurants will discourage diners disappointed by the food or service at Bukhara Grill from patronizing ITC's Bukhara restaurants. Assuming arguendo that ITC's interest in avoiding reputational damage to its overseas restaurants is a "reasonable interest" to be protected by United States law, ITC has failed to adduce an evidentiary basis for thinking such damage likely. See Ortho Pharm. Corp. v. Cosprophar, Inc., 32 F.3d at 694 (observing that "plaintiff must show more than a `subjective belief' that it will be damaged"). While a plaintiff need not demonstrate that it has, in fact, "lost sales because of the defendant's advertisements," to establish standing, it must demonstrate "the likelihood of injury and causation . . . in some manner." Id.
 
 
 163
 In an effort to carry this burden, ITC offers evidence that a significant percentage of defendants' customers are New Yorkers of Indian descent. It submits that these customers are more apt to travel to India than average New Yorkers and, therefore, more likely to come into contact with ITC's Bukhara restaurants. ITC asserts that, based on possible negative experiences at defendants' Bukhara Grill, these travelers will not patronize the ITC Bukharas, adversely affecting their earnings. ITC's reasoning depends on multiple levels of speculation, and its conclusion is too attenuated from the patronage profile evidence to demonstrate a real "likelihood of injury and causation" sufficient to confer standing to sue for false advertising. See Joint Stock Soc'y v. UDV N. Am., Inc., 266 F.3d 164, 181-85 (3d Cir. 2001) (rejecting Russian vodka producers' argument that they had standing to assert false advertising claim because advertisements by defendants in United States indirectly hurt sales of Russian vodka overseas).
 
 
 164
 c. The Possibility that ITC Might Again Open Bukhara Restaurants in the United States
 
 
 165
 In a final effort to establish standing, ITC argues that the United States represents an area of "natural expansion" for its current operations and that it is presently "considering" opening Bukhara restaurants here. Appellants' Br. at 45. ITC notes that in Berni v. International Gourmet Restaurants of America, 838 F.2d at 648, this court suggested that a plaintiff "considering establishing a commercial venture in the future" might, under some circumstances, have a sufficient commercial interest to sue a competitor for false advertising. The suggestion is dictum because the court ruled that the Berni plaintiff did not, in fact, have standing. Even if we were inclined, however, to hold that well-developed plans to enter a market constitute a sufficient commercial interest to be protected from false advertising, see, e.g., West Indian Sea Island Cotton Ass'n v. Threadtex, Inc., 761 F.Supp. 1041, 1049 n. 5 (S.D.N.Y.1991); National Lampoon, Inc. v. American Broad. Co., 376 F.Supp. 733, 746 (S.D.N.Y. 1974), aff'd on other grounds, 497 F.2d 1343 (2d Cir.1974), for reasons already discussed supra at 150, we conclude that ITC has failed to adduce evidence from which a reasonable jury could find that it had in fact formulated any such well-developed entry plan.
 
 
 166
 Accordingly, we conclude that the district court correctly dismissed ITC's false advertising claim for lack of standing.
 
 III. Conclusion
 To summarize, we conclude that:
 
 167
 (1) as a matter of law, ITC abandoned its United States rights in its registered "Bukhara" mark for restaurant services and, therefore, cannot assert a successful claim for trademark infringement under section 32(1)(a) of the Lanham Act or state common law; nor can it continue to maintain the registered mark, which the district court correctly ordered cancelled;
 
 
 168
 (2) plaintiff cannot assert a successful federal claim for unfair competition because Congress has not incorporated the substantive protections of the famous marks doctrine set forth in Paris Convention Article 6bis and TRIPs Article 16(2) into the relevant federal law, and this court cannot recognize the doctrine simply as a matter of sound policy;
 
 
 169
 (3) with respect to ITC's state law claim of unfair competition, we defer our ruling on this appeal pending the New York Court of Appeals' response to two questions: (a) whether the famous marks doctrine is recognized under the state's common law of unfair competition and, if so, (b) how famous a mark must be to qualify for such common law protection; and
 
 
 170
 (4) ITC lacks standing to assert a claim for false advertising under section 43(a)(1)(B) of the Lanham Act against the defendants.
 
 
 171
 DECISION AFFIRMED IN PART; RESERVED IN PART PENDING THE RESPONSE OF THE NEW YORK COURT OF APPEALS TO CERTIFIED QUESTIONS.
 
 CERTIFICATE
 
 172
 Upon further order of the court, the following questions will be certified to the New York Court of Appeals pursuant to Second Circuit Local Rule § 0.27 and N.Y. Comp.Codes R. & Regs. tit. 22, § 500.27(a), as ordered by the Court of Appeals for the Second Circuit:
 
 
 173
 1. Does New York common law permit the owner of a famous mark or trade dress to assert property rights therein by virtue of the owner's prior use of the mark or dress in a foreign country?
 
 
 174
 If so, how famous must a foreign mark be to permit a foreign mark owner to bring a claim for unfair competition?
 
 
 
 Notes:
 
 
 [1]
 The Honorable James L. Oakes, who was a member of this panel, retired following oral argument. The remaining two panel members, who agree on the disposition, decide this appeal pursuant to Local Rule § 0.14(b)
 
 
 [2]
 Although the term "famous marks" is often used to describe marks that qualify for protection under the federal anti-dilution statute,see 15 U.S.C. § 1125(c), the "famous marks" doctrine is, in fact, a different and distinct "legal concept under which a trademark or service mark is protected within a nation if it is well known in that nation even though the mark is not actually used or registered in that nation," 4 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 29.2, at 29-164 (4th ed.2002). Thus, the famous marks doctrine might more aptly be described as the famous foreign marks doctrine. It is in this latter sense that we reference the famous marks doctrine on this appeal.
 
 
 [3]
 Although we affirm the district court's dismissal of all ITC's federal claims, we hesitate to dismiss ITC's state claim as merely pendent,see, e.g., Giordano v. City of New York, 274 F.3d 740, 754 (2d Cir.2001), because it appears that we may have diversity jurisdiction over that claim. Nevertheless, given our decision to certify questions of state law regarding that claim, ITC might well consider its interests better served by transfer of the state claim for all purposes to state court. We will defer formal certification following issuance of this opinion to allow ITC ten days to communicate its wishes to the court. Defendants are afforded ten days more to respond.
 
 
 [4]
 The record indicates that in 2002 and 2003, the New Delhi Bukhara was named one of the world's fifty best restaurants by London-based "Restaurant" magazine
 
 
 [5]
 This product takes its name from a lentil dish served at the New Delhi Bukhara restaurant
 
 
 [6]
 ITC's amended complaint also charged defendants with false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a), and deceptive acts and practices in violation of New York General Business Law § 349, but it appears to have abandoned those claims in otherwise opposing defendants' motion for summary judgmentSee ITC Ltd. v. Punchgini, Inc., 373 F.Supp.2d at 278.
 
 
 [7]
 The statute states, in pertinent part:
 Any person who shall, without the consent of the registrant—
 (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . .
 shall be liable in a civil action by the registrant for the remedies hereinafter provided.
 15 U.S.C. § 1114(1)(a).
 
 
 [8]
 While the Lanham Act permits a person who has a bona fide intention to use a mark in commerce to apply to register the mark before actually using it in commerce,see 15 U.S.C. § 1051(b), the registrant must within six months file a verified statement that the mark has been used in commerce for the registration to be effective, see id. § 1051(d); see also WarnerVision Entm't v. Empire of Carolina, 101 F.3d 259, 260 (2d Cir.1996) (discussing registration of marks intended for use in commerce).
 
 
 [9]
 Although we have not previously stated specifically that a mark holder's intent to resume use of the mark must be formulated during the three-year period of non-use, we do so now, noting that two other circuit courts have also reached this conclusionSee, e.g., Imperial Tobacco, Ltd. v. Philip Morris, Inc., 899 F.2d at 1580-81 [Fed. Cir.] (expressly recognizing that intent must be formulated during non-use period); Emergency One, Inc. v. American FireEagle, Ltd., 228 F.3d at 537 [4th Cir.] (same). Indeed, we think this conclusion follows naturally from the fact that an abandoned mark may be appropriated for use by other actors in the marketplace. An intent to resume use of the mark formulated after more than three years of non-use cannot be invoked to dislodge the rights of another party who has commenced use of a mark — thereby acquiring priority rights in that mark — after three years of non-use. We do not, however, foreclose the use of evidence arising after the relevant three-year period to demonstrate an intent within that period to resume use.
 
 
 [10]
 The two factors identified inSilverman are not distinct but intertwined. A mark owner's reason for suspending use of a mark is relevant to abandonment analysis only as circumstantial evidence shedding possible light on his intent to resume future use within a reasonable period of time. In short, not every "reasonable suspension" will necessarily rebut a presumption of abandonment. See Silverman v. CBS, Inc., 870 F.2d at 47 (observing that "however laudable one might think CBS's motives to be, such motives cannot overcome the undisputed fact that CBS has not used its mark for more than 20 years and that, even now, it has no plans to resume [its] use in the reasonably foreseeable future," and further noting that "we see nothing in the statute that makes the consequence of an intent not to resume use turn on the worthiness of the motive for holding such intent").
 
 
 [11]
 We do not decide whether such allegations, if supported by evidence, would permit any inference of ITC's intent to resume use of the Bukhara mark for restaurants in the foreseeable future. We note only that the conclusion is by no means obvious
 
 
 [12]
 Indeed, there is no reason to think plaintiffs could make such a showing with respect to the New York hospitality market, which experienced considerable growth during the period 1997-2000See John Holusha, "Commercial Property; An Up Cycle Just Keeps Rolling," The New York Times 11:1 (Sept. 24, 2000) (noting historically high occupancy rates in city hotels with 13% growth in first half of year); cf. Marian Burros, "Waiter, Hold the Foie Gras: Slump Hits New York Dining," The New York Times A:1 (Sept. 4, 2001) (noting, in 2001, first signs of decline in city's 10-year restaurant boom).
 
 
 [13]
 In its amended complaint, ITC also asserted an unfair competition claim under section 44(h) of the Lanham ActSee 15 U.S.C. § 1126(h). The district court did not explicitly pass on this claim in dismissing the entirety of ITC's complaint, and ITC does not press it on this appeal. Accordingly, we deem any such claim waived, see Burkybile v. Bd. of Educ. of Hastings-on-Hudson Union, 411 F.3d 306, 308 n. 1 (2d Cir.2005), and we treat ITC's unfair competition claim as having been brought solely under section 43(a).
 
 
 [14]
 The "territoriality principle" stands in contrast to the so-called "universality principle," which posits that "if a trademark [is] lawfully affixed to merchandise in one country, the merchandise would carry that mark lawfully wherever it went and could not be deemed an infringer although transported to another country where the exclusive right to the mark was held by someone other than the owner of the merchandise."Osawa & Co. v. B & H Photo, 589 F.Supp. at 1171. The universality principle has been rejected in American trademark law. See American Circuit Breaker Corp. v. Or. Breakers, Inc., 406 F.3d at 581 (citing A. Bourjois & Co. v. Katzel, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923)).
 
 
 [15]
 The reach of Article6bis was extended to service marks by Article 16(2) of the Agreement on Trade-Related Aspects of Intellectual Property Rights ("TRIPs"), see generally Uruguay Round Agreements Act, Pub.L. No. 103-465, 108 Stat. 4809 (1994) (codified as amended at scattered sections of the United States Code), which states that "Article 6bis of the Paris Convention shall apply, mutatis mutandis, to services."
 
 
 [16]
 "Everything that comes from the sea."
 
 
 [17]
 Article10bis of the Paris Convention requires member states to "assure to nationals [of other member states] effective protection against unfair competition." Paris Convention, art. 10bis.
 
 
 [18]
 The Trademark Board's primary function is to determine whether trademarks are registerable and to conduct opposition and cancellation proceedings by which interested parties can dispute the claims of applicants and registrantsSee 15 U.S.C. §§ 1051, 1063-64.
 
 
 [19]
 InEmpresa Cubana, however, we did observe, in dictum, that "[t]o the extent that a foreign entity attempts to utilize the famous marks doctrine as [a] basis for its right to a U.S. trademark and seeks to prevent another entity from using the mark in the United States, the claim should be brought under Section 43(a)." Id. at 480 n. 10.
 
 
 [20]
 See infra at 161-64.
 
 
 [21]
 Self-executing treaties do not require implementing legislation and become effective as domestic law immediately upon entry into force. Non-self-executing treaties do not become effective as domestic law until implementing legislation is enactedSee Flores v. S. Peru Copper Corp., 414 F.3d 233, 257 n. 34 (2d Cir.2003).
 
 
 [22]
 But see International Café, S.A.L. v. Hard Rock Café Int'l, Inc., 252 F.3d 1274, 1277 n. 5 (11th Cir.2001) (concluding that the Paris Convention is not self-executing because, on its face, it provides for effectiveness through domestic implementing legislation).
 
 
 [23]
 See, e.g., Pub.L. No. 103-465, 514, 108 Stat. 4809, 4976 (amending 17 U.S.C. § 104A, governing copyrights in restored works, to comport with TRIPs); Pub.L. No. 103-465, 532, 108 Stat. 4809, 4983 (amending 35 U.S.C. § 154, governing United States patents, to comport with TRIPs). Significantly, Congress has enacted legislation to implement TRIPs Article 16(3), which contemplates the extension of anti-dilution protection to certain famous marks. See Federal Trademark Dilution Act of 1995, Pub.L. No. 104-98, 109 Stat. 985 (1995) (codified at 15 U.S.C. § 1125(c)); see H. Rep. 104-374, reprinted in 1995 U.S.C.C.A.N. 1029 (indicating that antidilution act was intended to make United States law consistent with terms of TRIPs and Paris Convention). No comparable legislation exists with respect to Article 16(2).
 
 
 [24]
 Section 44(b) states:
 Any person whose country of origin is a party to any convention or treaty relating to trademarks, trade or commercial names, or the repression of unfair competition, to which the United States is also a party, or extends reciprocal rights to nationals of the United States by law, shall be entitled to the benefits of this section under the conditions expressed herein to the extent necessary to give effect to any provision of such convention, treaty or reciprocal law, in addition to the rights to which any owner of a mark is otherwise entitled by this chapter.
 15 U.S.C. § 1126(b).
 Section 44(h) states:
 Any person designated in subsection (b) of this section as entitled to the benefits and subject to the provisions of this chapter shall be entitled to effective protection against unfair competition, and the remedies provided in this chapter for infringement of marks shall be available so far as they may be appropriate in repressing acts of unfair competition.
 Id. § 1126(h).
 
 
 [25]
 We discuss ITC's state law claim for unfair competition infra at 165
 
 
 [26]
 Because territoriality is the bedrock principle of trademark law, we understand the reference to "use in commerce" in the Lanham Act to contemplate use that, at some point in the transaction, implicates the United States
 
 
 [27]
 As recently as 2002, Congress amended the Lanham Act to bring United States law into compliance with the Madrid Protocol, another international agreementSee Madrid Protocol Implementation Act, Pub.L. No. 107-273, § 13402, 116 Stat. 1758, 1913 (2002) (codified at 15 U.S.C. § 1141) (providing mechanism to register marks in several nations).
 
 
 [28]
 See, e.g., Grupo Gigante S.A. De C.V. v. Dallo & Co., 391 F.3d at 1095; Buti v. Impressa Perosa, S.R.L., 139 F.3d at 104; Person's Co. v. Christman, 900 F.2d at 1570; Almacenes Exito S.A. v. El Gallo Meat Mkt., Inc., 381 F.Supp.2d at 328; De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc., 2005 U.S. Dist. LEXIS 9307 at *21-22.
 
 
 [29]
 See, e.g., 4 McCarthy, supra, § 29:4, at 29-12; Graeme B. Dinwoodie et al., International Intellectual Property Law and Policy 108 (2001).
 
 
 [30]
 In formulating both certified questions, we do not intend to limit the Court of Appeals' analysis or its response. That court may expand or modify the certified questions as it deems appropriate to indicate whether state common law recognizes the famous marks doctrine and the scope of that recognition
 
 
 [31]
 New York could, of course, conclude that a "secondary meaning plus" standard also applied to a foreign mark or dress that had previously been used in the United States where, as in this case, such domestic use had been abandoned
 
 
 [32]
 ITC pursues a false advertising claim exclusively under federal law, not state law